# Exhibit 2

2 of 2 DOCUMENTS

Copyright 2006 Factiva, a Dow Jones and Reuters Company
All Rights Reserved


factiva.

(Copyright (c) 2006, Dow Jones & Company, Inc.)

# THE WALL STREET JOURNAL

The Wall Street Journal

May 22, 2006 Monday

**SECTION:** Pg. A1

**LENGTH:** 3058 words

**HEADLINE:** Matter of Timing: Five More Companies Show Questionable Options Pattern --- Chip Industry's KLA-Tencor Among Firms With Grants Before Stock-Price Jumps --- A 20 Million-to-One Shot

**BYLINE:** By Charles Forelle and James Bandler

**BODY:**

In 2001, KLA-Tencor Corp., a leading semiconductor-equipment maker, granted its top executives, including Chairman Ken Levy, two batches of stock options. They arrived on unusually fortunate days for the executives: The first dated at the share price's first-half low; the second at its second-half low.

In all, Mr. Levy received 10 grants from KLA-Tencor and its predecessor company between 1994 and 2001 -- all preceding quick runups in the share price; an analysis by The Wall Street Journal found the probability that that pattern occurred merely by chance is tiny -- around one in 20 million.

Mr. Levy and company executives didn't return repeated phone and email messages.

Over the past two months, questions about the timing of executive options have rocked more than a dozen companies, leading to probes by board committees, securities regulators and federal prosecutors. Ten executives or directors at these companies have left their posts in recent weeks.

Now a fresh statistical examination by the Journal has turned up five additional companies, including KLA-Tencor, with highly improbable patterns of options grants, similar to those of some companies already facing scrutiny from federal authorities.

The newly identified companies span the U.S. and do everything from making telescopes to running dialysis clinics. One is Boston Communications Group Inc., a prepaid-wireless-technology provider, which in three out of five years gave grants to senior executives priced on the very day when its stock was at annual lows.

The five companies are noteworthy for nearly always awarding top executives option grants dated just ahead of a sharp rise in the company's share price. The dates also were often at the bottom of steep dips in the share price. The statistical analysis doesn't prove any wrongdoing. It is possible that the sharp rises after grants result from luck, a sense of market timing or some other factor. But the repeated grants before sharp stock gains raise the question of whether the grants were actually awarded later, then backdated to the more favorable time, or otherwise gamed.

The federal options probe has already tamped down share prices of companies under scrutiny and triggered yet another wave of suspicion about misbehavior in the executive suite. Backdating "represents the ultimate in greed," says Arthur Levitt, a former chairman of the Securities and Exchange Commission. "It is stealing, in effect. It is ripping off shareholders in an unconscionable way."

The methodology used by the Journal to detect highly improbable grant patterns was reviewed by David Yermack, an associate professor of finance at New York University's Stern School of Business, and by Erik Lie, an associate professor of finance at the University of Iowa. Both scholars have studied options timing. John Emerson, an assistant professor of statistics at Yale University, developed a computer program to calculate probabilities for the grants.

Mr. Lie, who wrote a watershed academic paper suggesting that options backdating could be pandemic, believes that scores more companies could come under the microscope. His data on thousands of option grants show that, on average, shares perform far better than normal in the periods after option dates. The aberration is so large, Mr. Lie says, that backdating or some other means of grant timing "must be widespread."

Last week, the U.S. Attorney for the Southern District of New York issued subpoenas to a half-dozen companies. Two more companies disclosed they had received inquiries from the SEC, which is examining at least 20 companies for potential backdating or other manipulation of options timing.

Wall Street analysts are sifting through securities filings for signs of fortunately timed options, figuring that disclosure of a problem, or even the specter of one, is likely to send shares of a company reeling. Several companies already caught up in the probe have said they will need to restate years of past financials to account for additional expense from granting underpriced options. UnitedHealth Group Inc., the giant Minnetonka, Minn.-based insurer, says it may need to restate three years of financial results, pulling down net income by as much as $286 million over the period.

Of the companies that are under scrutiny, one has fired three executives, and three resigned from another. At a third, Power Integrations Inc., the chairman and the finance chief resigned, and at Brooks Automation Inc. two directors stepped down.

Stock options have long been a popular carrot to dangle before top executives, giving them a stake in improving the shareholders' lot. The idea: The executives make money only if the share price rises. Typically, options for top executives can be granted only by the board or its compensation committee, and are supposed to carry a "strike," or exercise, price equal to the market value at the time the options are approved by directors. A recipient sometimes must wait a year or more for the option to "vest," then can cash out the option if the share price is above the option's strike price.

But backdating -- deliberately moving the grant date earlier, to a more beneficial time when the price was lower -- in effect gives the executive an instant paper profit, undermining the incentive purpose of options. Companies caught backdating risk disclosure and securities-fraud violations. Executives who perpetrate such a scheme can face wire fraud and other criminal charges.

It isn't yet clear how backdating may have been carried out. Grants typically are approved in writing by directors, and it's possible that in some cases documents were altered. Vitesse Semiconductor Corp. has fired three executives over the "integrity of documents" related to options. It's also possible that executives took advantage of directors' inattentiveness to secure retroactively priced grants, or directors may have knowingly approved a grant carrying an earlier date.

Most of the unusual options grants appear to have occurred from the mid-1990s through August 2002, when the Sarbanes-Oxley corporate-governance act tightened disclosure requirements, curtailing the potential for retroactively dated grants. Many companies, including some of the largest, grant options around the same time every year -- say, at the board's first-quarter meeting -- thus curbing the potential for backdating. Most of the unusually favorable grants occurred at companies that don't have a fixed schedule for doling out options.

Under accounting rules that were long in effect until recently, issuing a below-market option should trigger extra compensation expense, reducing a company's net income. Companies that failed to record that expense may have to restate their financial results, in some cases going back many years. Backdating also could run afoul of complex tax laws, requiring companies and individual to pay back taxes and penalties.

KLA-Tencor was formed from the merger of two major suppliers of semiconductor equipment. It is a powerhouse in the specialized and expensive gear used by the world's largest chipmakers to test the quality of their complex production systems. It has a market value of about $9 billion. Based in San Jose, Calif., KLA-Tencor has generated a fortune for Mr. Levy, the founder of one of its predecessors.

The company has assured shareholders -- whose holdings in the company get diluted each time an option is exercised -- that its option grants serve an important incentive purpose. "Stock options are granted at market price on the date of grant and will provide value to the executive officers only when the price of the Company's Common Stock in-

creases over the exercise price," KLA-Tencor's compensation committee members wrote in a report filed with the company's 2002 proxy statement.

KLA-Tencor's 2001 stock chart looks a bit like a "W," with sharp drops in April and October. Mr. Levy and other top executives were granted options dated at the very bottom of each dip. One grant carried an exercise price of $29.31; the other, $32.75. KLA-Tencor shares now trade around $45, which means the options could be yielding millions in gains.

But had either 2001 grant come a bit more than a month later, it would have carried an exercise price closer to $50, yielding zero potential profit today.

It wasn't the only time that KLA executives, including Mr. Levy, former CEO Kenneth Schroeder and current chief Rick Wallace, received propitious grants. Grants to Messrs. Levy and Schroeder in 1998 and 2000 also were dated at that year's lowest closing price.

The 1998 grant proved lucrative for the executives. Mr. Levy has reaped at least $6 million from cashing out options issued then, while Mr. Schroeder has pocketed at least $10 million. Mr. Levy didn't return phone or email messages. Neither the company's chief financial officer nor a company spokeswoman returned several messages seeking comment. Mr. Schroeder couldn't be reached to comment.

Among the other companies flagged by the Journal's analysis: Meade Instruments Corp., which makes telescopes familiar to amateur and professional astronomers. The Irvine, Calif., company, whose products are sold at Wal-Mart Stores Inc. outlets and elsewhere, had sales of $112 million in the fiscal year ended February 2005.

Between 1998 and 2002, founder John Diebel received six option grants. Two were dated at yearly-low closing prices. Another tied for a quarterly low. Immediately after one particularly well-timed grant, dated March 3, 2000, at the lowest closing price of that year, shares more than tripled over the next 20 trading days.

A statistical analysis indicates that the likelihood of a pattern as favorable, or more favorable, than Mr. Diebel's if grant dates had been chosen randomly -- without regard to share price -- is about one in 800,000.

Mr. Diebel said he was more concerned with building the business than executive compensation, and says that he made only about $60,000 on his options. "Not to seem cavalier," he said, "I never worked for money."

He said that given the "high level of integrity with which the company has been run and the quality of its legal advice both inside and outside the company, I would be shocked if there was any inappropriate activity with regard to Meade's granting of stock options."

The company's general counsel, Mark Peterson, said he believed all options were granted "in compliance with the terms and conditions" of the company's incentive plan and were in accord with applicable SEC rules and regulations. Mr. Peterson said he did not believe that options had ever been granted below fair market value at Meade. He also said the company to the best of "my knowledge has never granted options in order to take advantage of material nonpublic information."

All six of the companies named in a March article by the Journal, using the same statistical methodology, are facing government probes. Several, including UnitedHealth, Comverse Technology Inc. and Affiliated Computer Services Inc. have admitted to past problems with the option-grant process, and may restate earnings. Jabil Circuit Inc., of St. Petersburg, Fla., denied any problem with backdating.

The new analysis found that grants dated before sharp stock run-ups were also frequently enjoyed by E.Y. Snowden, chief executive of Boston Communications. In seven grants from 1998 to 2002, Mr. Snowden received options dated at the year's lowest close three times, with one of those three tying for the yearly low. Two others were dated at quarterly lows. (The first grant, not dated at a low point, was issued on the same day Mr. Snowden signed his employment agreement as CEO, according to the company's proxy.) The Journal estimates that the probability of Mr. Snowden's pattern occurring by chance is around one in five million.

Paul Gudonis, a director who sits on the company's compensation committee, said the grants "corresponded to compensation-committee meetings." Officials at Boston Communications, whose prospects have dimmed of late following the loss in May last year of a patent case, declined to comment. Mr. Snowden didn't return messages. The options currently can't be exercised for profit, because the company's share price has tumbled in recent years to below where it was when they were granted.

Matter of Timing: Five More Companies Show Questionable Options Pattern

Renal Care Group Inc., a Nashville-based company that offers dialysis services to tens of thousands of patients at hundreds of facilities, also shows a pattern of seemingly well-timed options. Between 1997 and 2002, it made six grants to top executives, including CEO Sam Brooks and No. 2 executive Gary Brukardt. Shares posted double-digit gains in the 20 trading days following five of the grant dates -- twice rising more than 30%. One grant landed on the year's low, and two others were dated at quarterly lows. The Journal's analysis puts the odds of the executives' pattern occurring if the dates had been chosen by chance at about one in 100 million.

Earlier this year, Germany-based Fresenius Medical Care AG bought Renal Care for $3.5 billion. Mr. Brukardt, who remains an executive of Fresenius, couldn't be reached for comment. A Renal Care spokeswoman declined to comment. Mr. Brooks died in 2003. The executives received grants with strike prices ranging from about $9 to about $19, adjusted for splits, from 1997 to 2002. Fresenius paid $48 a share to buy the company.

Douglas Chappell, former general counsel for Renal and a lawyer now with Fresenius, said Mr. Brooks would typically schedule compensation-committee meetings to coincide with low points in the company's stock price. Asked how Mr. Brooks could anticipate rises in the price time after time, Mr. Chappell said that Mr. Brooks's knowledge of the industry was such that he knew when a recovery was likely after a downturn. "It was inconceivable that there was backdating," Mr. Chappell said, "but it was not inconceivable that Mr. Brooks was looking to spread the wealth" by picking dates when the stock price was low.

Grants at Trident Microsystems Inc., a chipmaker in Sunnyvale, Calif., also preceded sharp run-ups. Each of seven grants between 1995 and 2001 to chief executive Frank Lin were dated ahead of a double-digit rise in share price over the next 20 trading days. That's all the more remarkable because between 1995 and 2001, Trident shares were generally heading down; indeed, they lost nearly 80% of their value between the time of Mr. Lin's first grant in 1995 and the last in 2001.

One grant, dated Dec. 20, 2000, came ahead of a 67% leap. The day tied for the lowest closing price of the year. According to the Journal's analysis, the odds of the seven-grant pattern having come by chance were around one in 100 million.

Trident's shares have been hot lately, thanks to strong demand for fancy televisions that Trident helps equip, such as flat-panel and high-definition sets. Mr. Lin realized $44 million by exercising options between July 1, 2005, and March 31, 2006. The options' value were enhanced by Trident's rising share price -- and by the fortuitous pricing of the options.

An outside lawyer for Trident, John Howard Clowes, said the company's normal option-granting time is late July to October. He said the December 2000 grant followed by two days a meeting in which shareholders approved additional shares for the company's option plan. Mr. Clowes said the board approved the grant, either at a meeting or through written consent, on Dec. 20. He said Mr. Lin declined to comment. Mr. Clowes declined to comment about the other grants.

John Edmunds, Trident's chief financial officer, said in an email yesterday that the company had referred the options-timing issue to the audit committee of its board. As for Mr. Lin's recent options gains, Mr. Edmunds said that the CEO had held all the grants more than seven years, including during a difficult time for Trident, and that the vast majority of his gains came from the recent surge in the company's stock price, not from the specific timing of any grant. "This was not a circumstance where someone got rich quickly or easily or made a lot of money simply because of the timing of the grant," Mr. Edmunds said.

Mr. Lie, of the University of Iowa, believes that only a small minority of the companies that may have engaged in backdating or grant-timing will turn up such extreme patterns. Those that may have moved grants by only a few days or weeks, to secure a small advantage, are unlikely to be flagged by statistics.

Among the companies with several highly unusual grants but not a stark overall pattern is B/E Aerospace Inc., a Wellington, Fla., maker of aircraft interiors. The company came under investor scrutiny late last week because its chief executive, Amin J. Khoury, was one of two directors who abruptly resigned from the board of Brooks Automation, a company caught up in the backdating probe.

Brooks Automation has said it will likely need to restate some seven years of earnings because of option problems. It is under investigation by the SEC. Mr. Khoury and the other director who resigned were on the company's compensation committee in 2000, and were the only directors to have received a favorably priced grant with the same date as the options granted to Brooks Automation's CEO. Brooks Automation said Mr. Khoury and the other director resigned vol-

Matter of Timing: Five More Companies Show Questionable Options Pattern

untarily, so that management and the board wouldn't be distracted by past events as they wrestle with the current situation.

But B/E Aerospace has its own history of unusually priced grants to Mr. Khoury. He received a grant priced on Dec. 17, 1997, at the lowest price of the second half of that year. Some other grants were priced at monthly or quarterly lows, though still others came at unremarkable times. Mr. Khoury couldn't be reached over the weekend, and he did not return messages last week.

Friday, following Mr. Khoury's resignation from the Brooks Automation board, shares in B/E Aerospace dropped 10% as investors fretted about possible repercussions for Mr. Khoury and his own company. In an interview Saturday, B/E Aerospace's finance chief, Tom McCaffrey, said all that company's grants were dated at the time they were approved by directors, and that the actions at Brooks Automation were "absolutely irrelevant" to B/E Aerospace.



**Buying Opportunity**
KLA-Tencor's daily closing share price
○ Dates of option grants to chairman Ken Levy
April 4
Oct. 2
J F M A M J J A S O N D
2001
Source: WSJ Market Data Group

Matter of Timing: Five More Companies Show Questionable Options Pattern



**NOTES:**

PUBLISHER: Dow Jones & Company, Inc.

LOAD-DATE: May 22, 2006